UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CAROLYN WARMUS,

                        Plaintiff,                    04 Civ. 8269 (SCR)(LMS)

    -against-

NEW YORK STATE DEPARTMENT OF                 AFFIDAVIT OF KIM BERG
CORRECTIONAL SERVICES, GLENN GOORD,       IN OPPOSITION TO
individually and in his capacity as Commissioner,       DEFENDANTS' MOTION
LUCIEN LeCLAIRE, individually and in his capacity    FOR A PROTECTIVE ORDER
as Deputy Commissioner for Facility Operations,
ADA PEREZ, individually and in her capacities as
Superintendent of Bedford Hills Correctional Facility
and former Assistant Commissioner for Facility
Operations, ANTHONY ANNUCCI, individually and
in his capacities as Deputy Commissioner and Counsel,
DONALD SELSKY, individually and in his capacity
as Director of Special Housing, ROBERT MURPHY,
individually and in his capacity as Assistant Director of
Special Housing, ELAINE LORD, individually and in
her official capacity as former Superintendent of Bedford
Hills Correctional Facility, TERRANCE MCELROY,
individually and in his former capacities as Deputy
Superintendent of Security and Interim Acting
Superintendent, JUDITH MACCALLA, individually
and in her capacity as Deputy Superintendent of
Programs LORI GOLDSTEIN, individually and in her
capacity as Medical Director, and BEDFORD HILLS
CORRECTIONAL FACILITY,

                        Defendants.
------------------------------------------------------------------x

State of New York    )
                        ) ss:
County of Westchester )

      KIM BERG, being duly sworn, deposes and says:

      1.  I am an attorney duly admitted to practice before this Court and an associate with

Lovett & Gould, LLP, attorneys for Plaintiff Carolyn Warmus in the above captioned matter. I

1

submit this affidavit on behalf of Plaintiff in opposition to Defendants' motion for a protective order.

2. On February 22 and 23, 2006, your affiant personally reviewed files at the New York State Inspector General's Office in Long Island City, New York. Assistant Attorney General Rebecca Ann Durden advised your affiant that the 283 files located there were identified by defendants in response to Plaintiff's request for complaints involving, *inter alia*, sexual misconduct at Bedford Hills Correctional Facility. The inspection occurred in accordance with this Court's January 11, 2006 Order governing inspection (*see* Exhibit 1 hereto).

3. The files your affiant inspected were the "closed" files from the Inspector General's sex crimes unit. Ms. Durden advised your affiant that these IG files were maintained both in Albany and Long Island City. While your affiant had agreed to travel to both locations to review the files, Ms. Durden and/or DOCS chose to move all files to Long Island City. In fact, the Court's January 11, 2006 Order was based on Ms. Durden's representation to the Court that the files were in Albany as the Order states the place of review to be Albany (*see* Ex. 1).

4. In accordance with the Court's Order, your affiant reviewed every file made available over the course of approximately 5 hours on February 22, 2006 and 2 ½ hours on February 23, 2006. In total, approximately 7 ½ hours was spent reviewing these files.

5. Each file contained a two to three page investigative summary at the beginning which identified the nature of the complaint, investigative action taken, and conclusion as to whether the case was "substantiated" or "unsubstantiated."

6. The Court's January 11, 2006 Order states that no notes could be "retained by plaintiff's counsel" and provided that counsel was to "identify the documents +/or files of which

2

copies are sought and provide that list or designation to defendant's counsel or representative at the conclusion of each session of review." (*see* Ex. 1).

7. Upon the commencement of your affiant's review of these files, Rebecca Ann Durden's assistant, Linda Moody, precluded counsel from taking any notes despite your affiant advising that the notes would be produced to Ms. Moody at the conclusion of each session of review. Since defense counsel would not permit that type of note taking, and in an effort to create a list of some sort so that later it could be ascertained what documents were being requested for discovery purposes, your affiant spoke with Ms. Durden and a mutual agreement was reached.

8. So as to come to an agreement without necessitating the Court's involvement, Ms. Durden and your affiant agreed on February 22, 2006 that Linda Moody would list the files we requested copies of and include for each file a very short statement of the reason for the request, such as if the request was based on identify of the officer targeted in the investigation or if it was based on a substantiated complaint. Ms. Moody also listed the case number for each file that Plaintiff did not request copies of at this time.

9. Exhibit A to Rebecca Ann Durden's March 10, 2006 declaration shows the type of short reasons provided by your affiant to Ms. Moody during the document review.

10. However, in providing a three or four word reason for production of the files, your affiant obviously did not include substantial detail or even every reason for the request pertaining to each file.

11. Your affiant cannot ascertain from Durden Ex. A the officer's true identities but the files requested that were based on specific officers were either: (1) officers who Plaintiff alleges are individuals who sexually abused and/or coerced either her or other BHCF female inmates;

and (2) officers who had more than one complaint lodged against them for sexually inappropriate contact and/or behavior as evidenced by more than one IG investigation into their behavior (*see* Durden Decl. Ex. A which shows repeated offenders).

12. Although your affiant did not personally maintain any notes pertaining to these files your affiant has a distinct recollection that the majority of these files did not consist of 75 or more pages as alleged by Mr. Maclaughlin in paragraph 5 of his declaration. Had each file been seventy-five to several hundred or more pages in length certainly the review of all 283 files would have taken a lot longer than a mere 7 ½ hours.

13. During your affiant's review of these files, Linda Moody stated that medical information was previously redacted, covered up, and/or contained in a sealed envelope in the file itself. The large part of these files did not even contain medical information. Medical information was rare, very short in length, and sporadic at best. And most files which contained medical information were marked with a "sticky note" on their exterior for easy identification of those records.

14. Aside from any physical evidence contained in sealed envelopes and boxes (ie. Hair or a paper towel) your affiant's specific recollection is that these files did not contain "oversize, double-sided or irregularly shaped documents and/or photographs" as Mr. Maclaughlin now declares. Furthermore, Plaintiff is not requesting that sealed envelopes and boxes be opened to provide such evidence as part of discovery in this case, nor do we believe that photocopies could be even be made of the material in those boxes and envelopes.

15. A protective order is currently in place which would prevent counsel from showing any of these files to Plaintiff and if the files or any portion thereof are to be filed with the Court, such as part of a motion, the pages are to be filed under seal.

16. During a prior court conference, Ms. Durden advised the Court that it is typical for the AG's office to black out the names of complainants, witnesses, and officers and assign to them a designation such as "Inmate A" or "Officer A." Ms. Durden also advised your affiant that was something routinely done and easily done by her office.

17. Plaintiff's counsel has significantly limited the request for production by decreasing the number of closed case files from 283 to 105. In addition, the production is being made of only closed files thereby already limiting the disclosure since all open files have not been identified and the inmate grievances similarly have not been identified or produced.

18. Your affiant's review of the 283 files also revealed several salient facts, including:

(a) IG investigators routinely closed files involving sex based complaints on the grounds that the complaint was unsubstantiated because the female prisoner was unable to provide "evidence" to "corroborate" her statement that she was the subject of inappropriate sexual contact, coercion, abuse, and even rape thereby supporting Plaintiff's claim of defendants' condoning sexually inappropriate, unsafe and illegal behavior on the part of DOCS staff;

(b) numerous officers at BHCF were the target of repeated complaints against them alleging inappropriate sexual contact, coercion, and abuse but yet these complaints went wholly unaddressed and ignored by reason the fact that the files were routinely closed on the ground that they were "unsubstantiated" -- even when substantial evidence existed to support the female inmates' account of what occurred;

(c) at least 25 of the 283 files were found to be "substantiated" thereby providing notice to the high ranking DOCS officials, namely the defendants here, that there was a prevalence of sexual abuse, coercion, and contact in BHCF;

(d) numerous female inmates became pregnant as a result of sexual intercourse with male officers thereby demonstrating defendants' knowledge of repeated sexual contact between staff and inmates; and

(e) in short the complaints of female inmates of unwanted sexual contact, sexual viewing and sexual *quid pro quo* in exchange for privileges are so numerous that the sheer number alone is sufficient to put defendants on notice of the need to implement appropriate policies, provide training and/or counseling, and install protective measures to protect inmates who are totally and completely subject to the control of the correction's staff.

19. Annexed hereto as Exhibit 2 are the relevant excerpts from "All Too Familiar: Sexual Abuse of Women in U.S. State Prisons" by the Human Rights Watch Women's Rights Project.

20. For the reasons set forth in the accompanying memorandum of law, Defendants' motion for a protective order should be denied in all respects.

WHEREFORE it is respectfully submitted that Defendants' motion for a protective order should denied in all respects.

_____
KIM BERG

Sworn to before me this
20th day of March, 2006.

_____
Notary Public

ANN B. FRANK
Notary Public, State of New York
No. 01FR5022348
Qualified in Westchester County
Commission Expires January 10, 2010

6

**EXHIBIT 1**

```
United States District Court                Before: Hon. Lisa Margaret Smith, USMJ
Southern District of New York
------------------------------------X
WARMUS                                       Docket# 04CV8269      SCR
                Plaintiff(s)
                                                         GP
        against
NYS CORRECTION
                                                     [U.S. DISTRICT COURT FILED JAN 11 2006 S.D. OF N.Y.]
------------------------------------X
                Defendant(s)

__Pretrial Conference   (In Person/Telephone)
__Settlement Conference
__Other_____

___Began        ___Held        ___Continued        ___Completed        ___Scheduled
Date 01/11/2006    Time 1400                  Duration (Min)_____

                    Kim Patricia Berg
                    Lovett & Gould
For Plaintiff       222 Bloomingdale Road - Suite 305
                    White Plains, NY 10605
                    (914) 428-8401
                    Fax: (914) 428-8916

                    Rebecca Ann Durden
                    NYS Assistant Attorney General
For Defendant       120 Broadway
                    New York, New York 10271-0332
                    212 416 8653
                    fax 212 416 6075
```

Remarks: Plaintiff's counsel may have access to the 283 closed files from the Inspector General's sex crimes unit that have been identified by defendant as responsive to Plaintiff's request. Review to take place in Albany at a location selected by defendant. Defendant's counsel [or] other representative may be present at and participate in the review. Review is for attorney's eyes only and no notes or other information is to be retained by plaintiff's counsel. Counsel shall identify the documents and/or files of which copies are sought and is to provide that list or designation to defendant's counsel or representative at the conclusion of each session of review. Issues about provision of those documents to be submitted to the undersigned. Medical records need not be reviewed.

/So Ordered/ Lisa Margaret Smith
Courtroom Deputy/USMJ

ADJOURNED DATE
TAPELOG
Tape
From    To

**EXHIBIT 2**

prisoner into the storage closet. On other occasions, "they'd be in the bubble [officers' station] and she'd be rubbing him."[47] Iris R. assumed that the officer's conduct was discovered, because at some point he was moved to another unit.

Pam M. was reportedly involved with two different officers at one prison. The relationship with Officer A began after he made sexual advances toward her. While he was on duty, either he came into her cell or she went to where he worked, and they went into the officers' bathroom. She told us, "The officers swap shifts, work overtime, to be with the women."[48] Pam M. became involved with Officer B after he put money in her account and started writing her letters and sending her packages. Pam M. said that Officer B told her, "I'm going to take you from him [Officer A]." He had her call his unit at night and, according to Pam M., bid to work on her unit. She said, "We were together. Everyone knew."

Rachel H. told us that she felt obliged to allow a corrections officer to kiss and grope her. She said:

> He used to bring me stuff . . . I felt I owed him. He did everything for me. I was away from my family and kid, upstate. I really felt like I owed him. I felt like he deserved it but he did it for a reason . . . He did it because he wanted to get the panties.[49]

Rachel H. also witnessed a woman on her hall having sex with an officer. She said:

> [The woman was] getting it in her room one day so she gets what she needs . . . She was against the wall gettin' it from one of the civilians in her room on the seventh floor.[50]

According to Rachel H., the woman was leaning against a wall while the officer stood behind her, with his pants down, engaging in sexual intercourse.

The superintendent at Bedford Hills, Elaine Lord, acknowledged that incarcerated women may be inclined to submit to sexual relations with prison staff.

---

[47] Telephone interview, July 12, 1994.

[48] Interview, New York, August 1994.

[49] Interview, New York, April 1994.

[50] Ibid.

She told us that she had been approached by women prisoners who viewed sexual relations with male officers as a necessary means to obtain certain things. Lord blamed this on the use of a male model for all prisoners. "The system creates a need to get . . . things. It's part of the problem of using a male model as your basis. There are too many things to be bargained for."[51] She cited the example of shampoo. DOCS provides all prisoners soap, but not shampoo; while soap alone may be sufficient for men, who have shorter hair, it is too dry for women and inappropriate for washing women's hair. In addition, Rhea Schaenman Mallet, formerly of the Correctional Association, informed us that DOCS allocates a set number of sanitary napkins to each prisoner for the year. This leads to a scarce supply of sanitary napkins, and many women are reusing napkins and sharing them.[52]

In some cases, prisoners told us that they engaged in sexual relations with officers for companionship or attention, not because they felt pressured. Such prisoners considered themselves willing participants in sexual relationships with officers. Their descriptions of the experience, however, frequently revealed the inappropriate, often abusive nature of such relationships. Once a sexual relationship with a correction employee has begun, prisoners generally find it difficult to end these sexual encounters. Iris R. told us, "I was really pressured, really trapped. I thought, my God, this person is really in control of me."[53] After she was transferred to a new work assignment, the officer used to corner her in the yard and set times and locations for her to meet him. One of the locations the officer chose was the basement of her work assignment. Three or four times, Iris R. told us, the officer locked her in the basement and left her there because he received a call on his radio. Iris R. allowed herself to believe her relationship with her work supervisor to be meaningful, even though she initially was, in her words, "scared to death." According to Iris R.:

> After awhile, he kind of sucked me in. You do it to make yourself feel okay. You have to feel an emotional [bond]. He told me lies . . . how much he cared about me, how much he

---

[51] Interview, Elaine Lord, Superintendent, Bedford Hills Corrections Center, June 22, 1994.

[52] Interview, Rhea Schaenman Mallet, Correctional Association of New York, January 30, 1996. A bill was introduced in 1996 by Sen. Catherine Abate requiring that female prisoners be able to receive sanitary napkins as needed.

[53] Telephone interview, July 12, 1994.

> wanted to be with me when I got out. It's a hard situation, that's what keeps you [involved].[54]

In Pam M.'s case, Officer B became increasingly possessive and violent as the relationship progressed:

> Nobody could talk to me. He became violent with his hands. If I was talking to another man, he would hit me. He had the impression I was gay. He would ticket another [woman] whenever I talked to her. . . . [At this prison,] there's no leaving an officer. You will have problems.[55]

Pam M. was subsequently transferred to another facility, where she became involved with another officer. While she felt that her relationship was not forcible, she stated that "basically you're using them, they're using you."[56] She described the prison as "like a camp where each officer is fucking five to six [women]." Pam M. stated that her relationship with the officer was well known within the prison. Both she and the officer were questioned, but both denied any involvement.

**Mistreatment of Prisoners Impregnated by Guards**

Over the years, a number of women have become pregnant by corrections staff while in custody and have been punished under Rule 101 of the prisoner rule book, which forbids sexual relations as well as soliciting or encouraging another person to engage in sexual relations. In the past, DOCS has penalized prisoners even when they stated that they were coerced into sexual intercourse with the guards, and the punishment has often been severe, including prolonged terms in segregation. As noted in the legal background chapter of this report, Human Rights Watch believes that under no circumstances should a prisoner who has had sexual contact with corrections staff be punished. The chilling effect that such punishment has on reports of sexual misconduct by guards far outweighs any benefit.

Ruth Cassell has represented seven prisoners impregnated by corrections employees over the last ten years. Cassell told us of a prisoner impregnated by a

---

[54] Ibid.

[55] Interview, New York, August 1994.

[56] Ibid.

---

guard in Bayview in Ma[...]
sick, blood tests determ[...]
began pressuring the pri[...]
the deputy superintende[...]
Hills, where she was p[...]
sexual offenses, and lew[...]
but because the prisone[...]
of false statements. The[...]
previously had stated w[...]
prisoner. According to [...]

Ruth Cassell to[...]
pregnant in June 1994 a[...]
her work supervisor. [...]
prisoner to meet him in [...]
with her. The prison[...]
supervisor reportedly b[...]

According to C[...]
out of DOCS and inves[...]
this young woman for s[...]
the hearing, she was se[...]
twenty-four-month loss [...]
prisoner was lying abou[...]
half months in segregati[...]
101 violation of engagi[...]
served. Thus, she was p[...]
was coerced into havin[...]

Iris R. was cha[...]
in segregation, after me[...]
R. learned of the pregna[...]
provided the details of [...]

---

[57] Interview, Ruth Cassel[...]

[58] Telephone interview, R[...]
did not induce a miscarri[...]

[59] Ibid.

[60] Telephone interview, J[...]

We were unable to locate any provision in DOCS policy indicating the appropriate sanction for sexual contact with a prisoner,[119] but our interviews with DOCS indicate that the appropriate sanctions would be dismissal. Anthony Annucci, DOCS counsel and deputy commissioner, told us that sexual relations with prisoners will not be tolerated and that the department has terminated employees for "mere letter writing."[120]

Contrary to Annucci's statement, it appears that even when reports are filed, not enough is done to pursue the allegations and to punish the officer responsible. According to a former DOCS employee,[121] he and a colleague filed an incident report on a corrections officer after they were approached by two female prisoners who told them that the officer was making passes at them and that, during count, while everyone else was locked in their rooms, he took two other prisoners into the closet for sexual activity. The former employee pursued the allegation by interviewing the two prisoners alleged to have been in the closet. Both, he said, denied the incident because, he believed, they were getting favorable treatment. Then he spoke to the corrections officer. In his words, "Once I talked to him and the women, I knew [it was true.]" He reported the incident to a captain and filed an incident report. But when he left the prison several months later, the officer was still at his job and nothing had happened. According to the former employee, the corrections officer had been investigated before for similar conduct and "had been doing it for years." As a result, he told us, nonsecurity staff had grown disillusioned with the procedure. They had ceased to file reports because of inaction on previous reports. When he himself saw nothing was done, the former employee said he, too, resisted pursuing other allegations. The prisoner impregnated by a guard at Bayview in mid-1995 provides another example. Although fifteen prisoners filed reports alleging that she was involved with a guard

---

[119] The DOCS employee manual merely provides that employees shall not engage in overfamiliar conduct with prisoners, but contains no table of disciplinary actions to correspond to a violation of this provision. Article 8 of the collective bargaining agreement between the corrections officers' union and the DOCS sets forth a range of disciplinary remedies available, but likewise has no table. Article 8.2 lists the following disciplinary sanctions "loss of leave credits or other privilege, written reprimand, fine, suspension without pay, reduction in grade, or dismissal from service."

[120] Telephone interview, Anthony Annucci, counsel, New York Department of Correctional Services, February 9, 1995.

[121] Interview, New York, January 17, 1994.